FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
BRITTANY N. DEJONG (258766)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:  619/234-4599

*Lead Counsel for the Class*

[Additional counsel appear on signature page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FILIP LAMBERT, JIGNESH PATEL AND REILLY CHASE, Individually and on Behalf Of All Others Similarly Situated,<br><br>　　Plaintiffs,<br><br>　　v.<br><br>BAKER TILLY HONG KONG LIMITED, ANDREW DAVID ROSS, and HELENA LAIHA KWOK<br><br>　　　Defendants. | Case No.: 2:14-cv-09959-CBM-MANx<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br>JUDGE: Hon. Consuelo B. Marshall<br>CTRM:  2, 2nd Floor |

Court-appointed lead Plaintiff Filip Lambert and additional named Plaintiffs Jignesh Patel and Reilly Chase (the "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against the Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things: (a) review and analysis of relevant filings made by China North East Petroleum Holdings Limited ("CNEP" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of CNEP's public documents; (c) information readily available on the internet; and (d) review and analysis of public documents concerning CNEP's independent auditor, the Defendants Baker Tilly Hong Kong Limited, Andrew David Ross, and Helena Laiha Kwok. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class (the "Class") consisting of all persons and entities other than the Defendants, who purchased the common stock of CNEP between September 3, 2010 and March 21, 2012, inclusive (the "Class Period"), seeking to recover damages caused by the Defendants' violations of federal securities laws.

2. During the Class Period, the Defendants (defined below) knowingly ignored red flags concerning CNEP executives' related-party transactions. Despite these red flags and actual knowledge, Defendants issued a false, unqualified audit opinion stating that the financial statements contained in CNEP's 2009 Form 10-K were audited in accordance with Public Company Accounting Oversight Board ("PCAOB") standards and in conformity with U.S. Generally Accepted Accounting Principles ("GAAP") and U.S. Generally Accepted Auditing Standards ("GAAS").

3.     The accounting practices employed by Defendants in connection with the audit were so deficient as to amount to no audit at all, and an egregious refusal to see the obvious and to investigate the doubtful.  The accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

4.     In fact, on December 17, 2014, the SEC filed a settled enforcement action against Baker Tilly Hong Kong Limited, Andrew David Ross, and Helena Laiha Kwok instituting sanctions and remedial measures against Baker Tilly, Ross, and Kwok for engaging in improper professional conduct, including violation of numerous PCAOB standards, when they misled investors by issuing false and misleading audit reports in connection with CNEP (the "SEC Action").

5.     The SEC Action is captioned, *In the Matter of Baker Tilly Hong Kong Limited, Andrew David Ross, CPA, and Kwok Laiha Helena, CPA,* File No. 3-16324 (attached hereto as Exhibit A).  Information contained in the SEC Action was unknown to the public until it was filed on December 17, 2014.

6.     The SEC Action revealed to the public that Defendants' audit of CNEP was so superficial and haphazard as to constitute no audit at all.  It was not until the filing of the SEC Action that investors were on notice of facts establishing Defendants' scienter.

7.     Defendants failed to abide by PCAOB standards as well as U.S. GAAP and GAAS, thereby materially misleading and harming CNEP's investors during the Class Period.

## **JURISDICTION AND VENUE**

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

10.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements were transmitted into this District.

11.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12.     Court appointed lead Plaintiff, Filip Lambert, purchased CNEP common stock during the Class Period as set forth in his certification (attached hereto as Exhibit B and previously submitted in connection with his motion for appointment as lead Plaintiff), and has suffered damages as a result.

13.     Additional Plaintiff Jignesh Patel purchased CNEP common stock during the Class Period as set forth in his certification (attached hereto as Exhibit C) and has suffered damages as a result.

14.     Additional Plaintiff Reilly Chase purchased CNEP common stock during the Class Period as set forth in his certification (attached hereto as Exhibit D) and has suffered damages as a result.

15.     Defendant Baker Tilly Hong Kong Limited ("Baker Tilly") is a PCAOB-registered audit firm based in Hong Kong.  Baker Tilly became CNEP's auditor on January 29, 2010.  During the Class Period, Baker Tilly issued a "clean" audit report containing an unqualified opinion that was filed with CNEP's financial statements in CNEP's Form 10-K for the year ended December 31, 2009.

16.     Defendant Andrew David Ross ("Ross") is the managing director of Baker Tilly and Chairman of its executive committee.  Ross was also the lead engagement director on the CNEP audit, and authorized the issuance of Baker Tilly's audit report.

17.     Defendant Helena Laiha Kwok ("Kwok") was a shareholder and director at Baker Tilly.  She was the director in charge of the 2009 year-end audit of CNEP.

18.     Baker Tilly, Ross, and Kwok are collectively referred to herein as Defendants.

### RELEVANT NON-PARTIES

19.     CNEP is a Nevada corporation engaged in oil exploration, production, and drilling through its operating subsidiaries located in the People's Republic of China ("China" or the "PRC").  At all relevant times, CNEP's common stock was traded on the NYSE under the ticker "NEP" or "CNEP."

### SUBSTANTIVE ALLEGATIONS

***Baker Tilly Becomes CNEP's Auditor***

20.     On January 29, 2010, the U.S. Audit Practice of Jimmy CH Cheung & Co., the Company's then-independent registered public accounting firm ("JCHC"), merged with Baker Tilly.  In connection with the merger, JCHC had resigned as the Company's independent registered public accounting firm and the Company, with the approval of its Board of Directors, engaged Baker Tilly to continue as the Company's independent registered public accounting firm.

***Initial Questions Concerning CNEP Financial Statements***

21.     While working on CNEP's 2009 10-K, on April 14, 2010, CNEP's Chairman of the Audit Committee of the Board of Directors, Robert C. Bruce, questioned a line item on the draft of the financial statement that showed $3.89 million was owed to the Company from a CNEP shareholder.

22.     CNEP's Chief Financial Officer ("CFO"), Zhang Yang, indicated that the line item reflected money owed to CNEP from CNEP director Ju Guizhi ("Ju") – the mother of CNEP's Chief Executive Officer ("CEO"), Wang Hongjun ("Wang").  The CFO disclosed to the Audit Committee that Ju and Wang regularly transferred money to and from CNEP's bank accounts and their personal bank accounts.

23.     On April 15, 2010, CNEP issued a press release announcing that it was delaying the filing of its annual report for the year ending December 31, 2009.  On the same day, the Board of Directors directed and authorized the Audit Committee to

conduct a thorough review of the situation and to determine what corrective action, if any, should be taken.

24.     On April 16, 2010, CNEP publically revealed in a press release filed as an exhibit to Form 8-K with the SEC that: (i) CNEP was facing delisting by NYSE AMEX due to its failure to file timely financial reports; (ii) the Company's internal investigation had uncovered certain potential internal control deficiencies over financial reporting in connection with certain expenditures relating to business development activities and the accounting treatment of certain of the Company's accounts payables; and (iii) CNEP's Audit Committee would "conduct a thorough review of the situation and to determine what corrective action, if any, should be taken."

25.     According to a May 27, 2010 press release, "On April 19, 2010, the Audit Committee retained the services of John Lees Associates Limited of Hong Kong ("JLA") to conduct a forensic audit of the Company's bank accounts with respect to the expenditures relating to business development activities in question."

26.     JLA subsequently presented its initial forensic report concerning the related party transactions to the Company.  According to the preliminary report, "in 2009, cash transfers occurred between the bank accounts of the Company and its subsidiaries and the personal bank accounts of Mr. Hongjun Wang, the Company's chief executive officer, and Ms. Guizhi Ju, a Company director and mother of Mr. Hongjun Wang. The forensic audit has confirmed that some of the transferred funds were used to pay the Company's expenses.  To date, there is no indication that any of the funds were used for personal purposes.  The forensic audit is ongoing."

27.     In response to the initial report, on May 6, 2010, the Board of Directors adopted a specific policy that "none of its assets, including cash, should be transferred or paid to any officer or director of the Company or its subsidiaries for any purpose without the approval of the Audit Committee other than (i) payment of transfers pursuant to service agreements between the Company and its officers and directors

- 5 -

duly authorized and adopted by the Board of Directors or its committees; or (ii) reimbursement of reasonable expenses not exceeding $10,000 in any given week."

28. In addition, the Company scheduled a special meeting for May 21 and 22, 2010, to discuss the preliminary JLA report.

29. At the conclusion of the special meeting, CEO Wang was placed on leave and resigned from his position as Chairman of the Board on May 23, 2010. Director Ju, CEO Wang's mother, resigned as a director of CNEP on May 23, 2010.

30. On May 27, 2010, CNEP issued a press release announcing that CFO Yang resigned as well as other members of management including CEO Wang and Director Ju, as stated above.

31. The press release also announced that NYSE AMEX had halted trading of CNEP stock on May 25, 2010 for failing to comply with listing standards due to the delay in filing the 2009 Form 10-K. The press release stated in relevant part:

> On May 25, 2010, the Company received a written notice from NYSE AMEX LLC ("AMEX") advising that the Company is not in compliance with AMEX's continuing listing criteria set forth in Sections 134 and 1101 of the NYSE Amex LLC Company Guide (the "Company Guide"). Specifically, AMEX noted that the Company has not timely filed its annual report on Form 10-K for the fiscal year ended December 31, 2009 and its quarterly report on Form 10-Q for the quarter ended March 31, 2010 (together, the "Reports"). In addition, AMEX stated that the Company's failure to file its Reports is a material violation of its listing agreement. Pursuant to 1003(d) of the Company Guide, AMEX is authorized to suspend, and unless prompt corrective action is taken, remove the Company's common stock from AMEX. AMEX halted trading of the Company's common stock on the same day.

> ***

> The Company also previously disclosed in a press release issued on April 16, 2010 and as an exhibit to its current report on From 8-K

- 6 -

filed on April 16, 2010, that, in the process of the Company's 2009 year end audit review, the Company identified potential internal control deficiencies over financial reporting in connection with certain expenditures relating to business development activities and the accounting treatment of certain of the Company's accounts payables. In response, on April 15, 2010, the Board of Directors directed and authorized the Audit Committee of the Board of Directors (the "Audit Committee") to conduct a thorough review of the situation and to determine what corrective action, if any, should be taken.

On April 19, 2010, the Audit Committee retained the services of John Lees & Associates Limited of Hong Kong ("JLA") to conduct a forensic audit of the Company's bank accounts with respect to the expenditures relating to business development activities in question. ***The forensic audit preliminarily found that in 2009, cash transfers occurred between the bank accounts of the Company and its subsidiaries and the personal bank accounts of Mr. Hongjun Wang, the Company's chief executive officer, and Ms. Guizhi Ju, a Company director and mother of Mr. Hongjun Wang. The forensic audit has confirmed that some of the transferred funds were used to pay the Company's expenses.*** To date, there is no indication that any of the funds were used for personal purposes. The forensic audit is ongoing. (Emphasis added).

### *The Board and Defendants Receive the Final JLA Report*

32.     On July 10, 2010, JLA submitted its final forensic accounting report to CNEP (the "JLA Forensic Report"), attached hereto as Exhibit E. The contents of the JLA Forensic Report were not made public in any way at this time.

33.     The JLA Forensic Report highlighted numerous red flags concerning internal control deficiencies:

- 7 -

a.     176 related-party transactions totaling approximately $59 million during 2009. Of the $59 million, approximately $28 million went from CNEP to Wang and Ju, equaling around 41% of CNEP's 2009 reported annual revenues;

b.     Approximately $11 million that Wang and Ju allegedly loaned to CNEP, as well as expenses paid by Wang and Ju on behalf of CNEP;

c.     Approximately $20 million that would have remained due from Wang and Ju at the end of 2009 was reduced to zero through year-end consolidation and post-year-end closing adjustments that lacked supporting documentation or were otherwise questionable.

d.     The ability of management to override internal controls and access CNEP's bank accounts;

e.     Unauthorized related-party transactions, including cash withdrawals, payments to vendors, and investments made by insiders on behalf of CNEP without authorization were possible, in part, because of insufficient verification of payments;

f.     Inadequate segregation of duties among employees in accounts payable and cash management areas that could result in the misappropriation of Company funds;

g.     Failure to implement and comply with Chinese Interim Cash Control Regulations and Internal Policy concerning cash disbursements, including the lack of a policy related to amounts that could be advanced to Company personnel to make purchases on behalf of the Company;

h.     Incomplete audit trail for the related-party transactions;

i.     Convoluted and inappropriate account offsets of amounts owed to CNEP by insiders, including Wang and Ju, based on agreements that were mostly unsigned and contained contradictory statements or amounts;

j.     Insufficient internal controls to require written approval for the period-end adjustments could result in intentional or unintentional errors in financial statements; and

k.      Varied explanations and numerous other abnormities were noted in documentation of the transactions related to fixed asset prepayments to suppliers purportedly paid through Ju's personal bank account.

34.      According to the SEC Action, Defendants Ross and Kwok received the JLA Forensic Report on or about July 12, 2010.

35.      But, after receiving the JLA Forensic Report, Ross, Kwok and the engagement team failed to: (i) adequately review the report; (ii) adequately revise the firm's audit planning regarding fraud risks; or (iii) audit the material related-party transactions in accordance with PCAOB standards.

36.      On July 22, 2010, Company Director and Chairman of the Audit Committee, Robert C. Bruce, wrote to the CNEP Board of Directors urging the members to take additional steps to investigate the issues set forth in the JLA Forensic Report.

37.      Mr. Bruce's letter observed that "the Company must take additional steps to investigate questions raised by the [JLA Forensic Report] including: a) whether the Company's previously filed financial reports and associated financial statements are materially correct under U.S. Generally Accepted Accounting Principles ("US GAAP").

38.      On August 5, 2010, the Chairman of CNEP's Board of Directors, Edward Rule, responded to Mr. Bruce's letter, arguing that there was no need for a full investigation in response to the JLA Forensic Report.

39.      On August 8, 2010, in response to Mr. Rule's letter, Mr. Bruce resigned, citing his belief that CNEP had not adequately addressed the troubling findings of the JLA Forensic Report.  The resignation letter was filed as an exhibit to Form 8-K filed with the SEC.

40.      In relevant part, the resignation letter explained as follows:

I strongly believe that substantial additional investigation is required in order for the Company and/or the members of the board to be confident that the Company's previously filed financial reports and

associated financial statements are materially correct under U.S. Generally Accepted Accounting Principles ("US GAAP"), and that the Company has not made payments to government officials as proscribed by the U.S. Foreign Corrupt Practices Act ("FCPA"). In his capacity as Chairman of the board, Mr. Rule responded to my July 22nd letter on August 5, 2010, and presumably did so on behalf of the Company and other members of the board. In his August 5th letter, Mr. Rule makes it quite clear that he and the Company disagree with and will not support my recommendations.

With all due respect, as I detailed in my July 22nd letter to the board, I believe that the Company can best serve the interests of its shareholders by taking the steps that are necessary to regain confidence that it's [sic] previously filed financial statements, the pending restatements and related internal controls are in compliance with applicable securities laws and regulations.

As noted above, I believe our differing views on this critical question represent a fundamental disagreement that I have with the Company and the board relating to a matter of operation, policy or practice. Therefore, I believe I have no choice but to tender my resignation, effective immediately, and note that this letter, as well as my attached letter of July 22, 2010, should be filed as an exhibit as part of the Company's required report under Item 5.02 of SEC form 8-K.

41. On August 27, 2010, CNEP announced that it expected to finally file the late financial reports by August 31, 2010, after having previously submitted a plan to AMEX setting forth the actions the Company had and would take to bring the Company into compliance with AMEX's continued listing standards.

///

///

///

***The Class Period Begins***

42.     On September 3, 2010 CNEP finally filed its Form 10-K for the year ending December 31, 2009 with the SEC.  CNEP's financial statements were included with the 2009 Form 10-K.

43.     When companies register their securities with the SEC and file annual and other reports, they must disclose important financial information.  In many cases, this information must be audited.

44.     As the SEC has explained, an auditor is an independent certified public accountant who examines the financial statements that a company's management has prepared. The federal securities laws ***require*** publicly held companies that file reports with the SEC to submit financial statements that are accurate, truthful, and complete and prepared according to GAAP accounting standards.

45.     Many of these financial statements — including those in the company's annual report and those provided to shareholders in connection with the solicitation of proxies for annual meetings — must be examined and reported on by an independent auditor.

46.     A company's outside, independent auditor examines the company's financial statements and provides a written report that certifies, among other things, that the auditor conducted its audit in accordance with PCAOB standards, and that the financial statements of the company are fairly stated and comply in all material respects with GAAP.

47.     A company's management has the responsibility for preparing the company's financial statements and related disclosures. The company's outside, independent auditor then subjects the financial statements and disclosures to an audit. During the audit, the outside auditor obtains an understanding of the company's internal controls and then applies "auditing procedures" pursuant to and provided for in PCAOB standards, which may include inspection of the company's books and records, observation, inquiries, and confirmations.

48.     The procedures the outside auditor uses ***must*** be sufficient to allow the auditor to obtain enough competent evidence to express an opinion on the fairness of the financial statements and whether they conform to GAAP in all material respects. If the auditor cannot reach that conclusion, then the auditor must either require the company to change the financial statements or decline to issue a standard audit report.

49.     An audit report provides the public with additional assurance — beyond managements' own assertions — that a company's financial statements can be relied upon.  As the Supreme Court stated in the landmark case of *United States v. Arthur Young & Co*., 465 U.S. 805, 819 n.15 (1984): "The SEC requires the filing of audited financial statements in order to obviate the fear of loss from reliance on inaccurate information, thereby encouraging public investment in the Nation's industries." That has important implications for investors making investment decisions, for banks and financial institutions that may extend credit or make loans to the company, and for other businesses and members of the public who deal with the company.

50.     Included in the 2009 Form 10-K was the Report of Independent Registered Public Accounting Firm stating:

> The Board of Directors and Stockholders of:
>
> China North East Petroleum Holdings Limited
>
> We have audited the accompanying consolidated balance sheet of China North East Petroleum Holdings Limited (the "Company") and subsidiaries as of December 31, 2009, and the related consolidated statements of operations and comprehensive income, stockholders' equity and cash flows for the year then ended. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.
>
> ***We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).*** Those standards require that we plan and perform the audit to obtain reasonable

assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provide a reasonable basis for our opinion.

*In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Company and subsidiaries as of December 31, 2009, and the results of its operations and cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.*

We have also audited the adjustments as described in Note 1 to the consolidated financial statements that were applied to restate the 2008 financial statements to correct the errors. In our opinion, such adjustments are appropriate and have been properly applied. We were not engaged to audit, review or apply any procedures to the 2008 financial statements of the Company other than with respect to the adjustments and accordingly, we do not express an opinion or any other form of assurance on the 2008 financial statements taken as a whole.

/s/ Baker Tilly Hong Kong Limited

BAKER TILLY HONG KONG LIMITED

Certified Public Accountants

- 13 -

Hong Kong

Date: September 3, 2010

China North East Petroleum Holdings Limited, Annual Report (Form 10-K) at F-2 (Sept. 3, 2010) (emphasis added).

51.     On September 8, 2010, CNEP reported that after making all requisite filings, the Company received notice from NYSE Amex LLC that the Company was again in compliance with NYSE Amex LLC's continued listing requirements. As a result, the Company resumed trading on September 9, 2010.

52.     Baker Tilly's unqualified audit report was materially false and misleading because: (a) the audit had not been conducted in accordance with PCAOB standards; and (b) CNEP's financial statements did not fairly present CNEP's financial position  and did not comport to GAAP.

53.     The Company's financial statements did not fairly present CNEP's financial position and did not comport to GAAP because SEC regulations and GAAP require disclosure of material related party transactions as follows:

a.     GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

b.     GAAP is the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

c.     The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").

d.     SEC and NASDAQ rules and regulations require that publicly traded companies such as CNEP include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC.  See Section 13 of the Exchange Act; Rule 10-01(d) of Regulation S-X.

e.      SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).

f.      GAAP Statement of Financial Accounting Standards ("SFAS") and SEC regulation S-K required the Company to disclose all material related party transactions.

g.      SFAS No. 57 and No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS Nos. 57, ¶ 2; 850-10-50-1.

h.      "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." SFAS No. 57, ¶ 1; *see also* SFAS No. 850-10-05-3. "Affiliate" includes any company that is under common control or management with the public company.  SFAS Nos. 57, ¶ 24(a, b); 850-10-20.

i.      Disclosures of related party transactions shall include: (a) the nature of the relationship involved; (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements; (c) the dollar amount of transactions for each of the periods for which income statements are presented; and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. SFAS Nos. 57, ¶ 2; 850-10-50-1.

54.      The Company's financial statements do not comport with GAAP as they failed to disclose over $59 million in material related party transactions.

55.      Specifically, contrary to the Audit Report, CNEP's financial statements included in the 2009 Form 10-K failed to properly disclose material related-party transactions. CNEP had only disclosed that as of December 31, 2009, the Company owed a stockholder $89,269. The 2009 Form 10-K did not disclose that the stockholder

referenced was former CEO Wang and that the $89,269 was the net result of 176 related-party transactions between CNEP, Wang and his mother, former director Ju. It also did not disclose that these transactions totaled ***approximately $59 million.***

56.     Furthermore, the financial statements approved by Defendants in the 2009 Form 10-K did not: (i) provide any information regarding the description of the transactions; (ii) the nature of the relationships involved; (iii) the amounts involved; (iv) the terms and manner of settlement of the transactions; (v) that many of these transactions involved the CEO's family members; and (vi) any other information that was deemed necessary to understand the significant and unusual transactions on the financial statements as required by GAAP.

57.     Contrary to the Audit Report, the audit was not conducted in accordance with PCAOB standards for the following reasons:

a.     Defendants knowingly ignored enumerated fraud risks.  PCAOB Standard AU § 316 sets forth certain fraud risks or red flags: (a) unsupported balances or transactions; (b) inconsistent, vague or implausible responses from management arising from inquiries or analytical procedures; (c) poor safeguards over cash; (d) lack of timely and appropriate documents; (e) last minute adjustments by the entity that significantly affect financial results; (f) missing documents; (g) improper classification of transactions; (h) missing inventory or physical  assets of a significant magnitude; (i) large or unusual transactions at period-end; and (j) evasive or unreasonable responses of management to audit reports.

b.     For example, according to the SEC Action, Baker Tilly's workpapers do not reflect that Ross, Kwok, or anyone on the engagement team made any meaningful inquiry as to the nature or business purpose of the other material, related-party transactions, or that they performed sufficient substantive procedures to verify those transactions.

c.     Post year-end closing adjustments significantly reduced the amounts that Wang and Ju owed CNEP; however, Defendants' testing in this area was superficial at best. According to the JLA Forensic Report, the post year-end

adjustments included transactions to record $5.0 million in "balance transfers" due from CNEP to Wang and Ju and $6.7 million related to the "amount paid by Ms. Ju for acquiring Tian Cheng." Nothing in Defendants' workpapers indicates that they applied sufficient procedures to substantiate these post year-end adjustments. *See* SEC Action at 10.

d.      Another of the 176 related-party transactions involved Wang's purported capital infusion of $4.6 million into CNEP's subsidiary, Song Yuan Technical, on September 23, 2009. However, according to the bank statement for the account in which CNEP's 2009 offering proceeds were deposited, the $4.6 million was transferred from CNEP, not Wang. Baker Tilly's workpapers also contain conflicting accounts of the source of the $4.6 million. Defendants failed to determine and document the true source of the $4.6 million before issuing the audit report containing an unqualified opinion. *Id*. at 11.

e.      To test whether Wang was owed substantial sums by CNEP, Defendants sent the confirmation papers to Wang himself. Wang was not a third party and, given the risk, this "confirmation process" was not sufficient to determine the completeness, existence or accuracy of the purported debt to Wang. As such, additional evidence should have been obtained but was not. *Id*.

f.      Prior to issuing the clean audit report in the 2009 Form 10-K, Defendants had access to the JLA Forensic Report and yet did not take any action to disclose or examine the red flags and weaknesses at CNEP. Nor did Defendants adjust their audit procedures in light of the findings in the JLA Forensic Report.

g.      Defendants had ample time and opportunity to review the JLA Forensic Report and include its findings in their 2009 audit of CNEP.

h.      The SEC Action concluded that Defendants engaged in improper professional conduct pursuant to Rule 102(e)(1)(ii) of the Commission's Rules of Practice and Section 4C of the Exchange Act. Additionally, the Commission found that Defendants violated Section 10A(a)(2) of the Exchange Act.

58.     In short, Defendants knowingly or recklessly misrepresented that Defendants had conducted audits of CNEP's financial statements in accordance with the standards of GAAP and the PCAOB, and that Defendants' statements presented fairly, in all material respects, the financial position of CNEP.

***The Truth Is Revealed and the Class Period Ends***

59.     On March 1, 2012 the SEC notified CNEP that it was halting trading of the Company's stock.  The SEC notice explained as follows:

> Questions have arisen regarding the accuracy and completeness of information contained in NEP's public filings with the Commission concerning, among other things, certain transfers of cash from the company's bank accounts to the personal bank accounts of related parties.

SEC Release No. 66494 / March 1, 2012.

60.     On the same day, the SEC issued an order suspending trading.  The Order of Suspension of Trading announced and explained that it appeared to the SEC that "there is a lack of current and accurate information concerning the securities of" CNEP.  The SEC observed that "the public interest and the protection of investors require a suspension of trading in the securities of" CNEP.

61.     On March 14, 2012 CNEP issued a press release providing detail concerning the SEC's action:

> HARBIN, CHINA and NEW YORK, March 14, 2012 – China North East Petroleum Holdings Limited (the "Company") (NYSE Amex: NEP), announced that as previously announced on March 1, 2012, the Company discovered that the Securities & Exchange Commission ("SEC") issued an Order of Suspension of Trading of the stock of the Company. ***In the Order, the SEC stated that: "Questions have arisen regarding the accuracy and completeness of information contained in NEP's public filings with the Commission concerning,***

- 18 -

*among other things, certain transfers of cash from the company's bank accounts to the personal bank accounts of related parties."*

The trading suspension appears related to an investigation the Staff of the SEC is conducting that addresses these issues. *Although the Company cannot be certain of the scope of the investigation, it appears that the principal focus is on various related party transactions aggregating approximately $3.9 million that occurred in 2009 and were identified in the previously-disclosed report provided to the Company by John Lees & Associates, the accuracy of the Company's books and records and financial statements concerning those transactions, and related disclosures in the Company's 2009 S-3 registration statement and S-8 registration statements.*

(Emphasis added).

62.     On March 21, 2012, CNEP announced that its March 14, 2012 press release contained a typographical error.  Specifically, "the reference in the second paragraph of the March 14, 2012 press release to $3.9 million should have said $39 million."

63.     CNEP's March 14 and 21 announcements were the first public disclosure of any information concerning the scope of related party transactions set forth in the JLA Forensic Report.

64.     On April 11, 2012, CNEP announced that it received a letter from NYSE Regulation, Inc. in which NYSE Staff alleged the Company no longer complied with NYSE's continued listing standards as set forth in the Company Guide and its securities were, therefore, subject to delisting from the NYSE.  The NYSE allegations primarily related to "issues concerning documentation and disclosures for transactions between the Company and related parties, including those identified in the John Lees & Associates report to the Company, dated July 2010, and the failure of the Company to file its Form 10-K for 2011 on time."

65.     In response, the Company moved its listing to the Other-OTC Market under the ticker symbol "CNEP" as of June 21, 2012.

66.     Almost contemporaneously with the SEC's suspension of CNEP shares, the SEC's Office of Investor Education and Advocacy issued an Investor Bulletin to help educate investors about the SEC's rules and regulations related to trading suspensions. *See* Exhibit F attached hereto.

67.     As set forth in the bulletin, the federal securities laws generally allow the SEC to suspend trading in any stock for up to ten business days (*see* SEC's March 1, 2012 order suspending CNEP shares pursuant to Section 12(k) of the Exchange Act). The SEC may suspend trading in a stock when the Commission is of the opinion that a suspension is required to protect investors and the public interest. Circumstances that might lead the Commission to suspend trading include: (i) a lack of current, accurate, or adequate information about the company, for example, when a company is not current in its filings of periodic reports; (ii) questions about the accuracy of publicly available information, including in company press releases and reports, about the company's current operational status, financial condition, or business transactions; and (iii)   questions about trading in the stock, including trading by insiders, potential market manipulation, and the ability to clear and settle transactions in the stock.

68.     The SEC itself acknowledges that a trading suspension pursuant to Section 12(k) of the Exchange Act like the one enacted in this case "may raise serious questions and cast doubts about the company in the minds of investors.  While some investors may be willing to buy the company's stock, they will do so only at significantly lower prices."  *See* Exhibit F at 3.

69.     Indeed, "investors should be very cautious in considering an investment in a stock following a trading suspension. At the very least, investors should assure themselves that they have current and reliable information about a company before investing." *Id*.

70.     In fact, "The SEC suspends trading in a security when it is of the opinion that the suspension is required in the public interest and to protect investors. Because a

suspension often causes a dramatic decline in the price of the security, ***the SEC suspends trading <u>only</u> when it believes that the public may be making investment decisions based on a lack of information, or false or misleading information. A suspension may prevent potential investors from being victimized by a fraud.*** *Id*. (emphasis added).

71.     CNEP stock resumed trading on June 22, 2012.

72.     The price of CNEP shares plummeted from the previous trading day's price (which was February 29, 2012), falling $2.73 per share – ***almost 88%*** – closing at just $0.38 per share.

73.     This was the first trading day after disclosure that: (i) there was a lack of current and accurate information concerning CNEP securities; (ii) CNEP's stock was subject to delisting by the NYSE for failure to disclose material related party transactions; and (iii) the SEC was investigating material undisclosed related party transactions, concerning  among other things, the transfers of cash from the Company's bank accounts to the personal bank accounts of related parties as set forth in the JLA Forensic Report. These nondisclosures raised significant questions regarding the accuracy and completeness of information contained in CNEP's SEC filings.

74.     The significant decline in CNEP's stock price was proximately caused by the SEC's drastic decision to suspend trading in CNEP shares and the revelation of the information in the SEC's order associated with the trading suspension.

75.     Specifically, the SEC's order revealed that the SEC believed that a suspension would prevent potential investors from being victimized by a fraud due to "a lack of current and accurate information concerning" CNEP securities and questions about the accuracy and completeness of information contained in CNEP's public filings with the SEC concerning, among other things, certain transfers of cash from the Company's bank accounts to the personal bank accounts of related parties.

76.     The accuracy and completeness of CNEP's public filings with the SEC was the ***very same subject matter*** – in fact, the ***<u>only</u>*** subject matter – that Baker Tilly addressed in its audit opinion.

77.    The SEC's announcement and subsequent March 14 and 21 press releases revealed that Baker Tilly's audit report **had not** been conducted in accordance with PCAOB standards and that CNEP's financial statements **did not** fairly present CNEP's position and results in conformity with GAAP.

78.    In this way, the fraudulent practices were revealed to the market and caused the resulting loss to CNEP shareholders.

79.    Indeed, Baker Tilly's representations **could not be true** in light of the SEC's order because the SEC order revealed to the market that, directly contrary to Baker Tilly's representations, there was a lack of current and accurate information concerning CNEP shares in the Company's public filings.

80.    Indeed, the reason there was a lack of current and accurate information concerning CNEP in its public filings was because CNEP failed to disclose material related party transactions.   Such transactions were required to be disclosed under GAAP, and they were not.

81.    The decline in CNEP's stock price on the first day it resumed trading was not due to changing market conditions, changing investor expectations, or other unrelated factors.

82.    Indeed, the SEC **acknowledges** a connection between a trading suspension and subsequent drop in stock price.

83.    On July 6, 2012, the NYSE filed a Form 25 delisting the common stock effective on July 16, 2012, explaining as follows:

> The Company is subject to delisting pursuant to Section 120 of the Company Guide in that the Company or its management has failed to adequately control related party transactions.  Specifically, Section 120 of the Company Guide requires listed companies to "subject related party transactions to appropriate review and oversight by the Company's Audit Committee or a comparable body of the Board of Directors."  In that regard, the Company failed to provide proof of board and audit committee approvals in connection with various related party

transactions including transactions totaling approximately $39 million in 2009 that were previously identified by John Lees & Associates Limited ("JLA").

84.    CNEP shares continued to trade on the OTC Link (formerly the Pink Sheets) on a downhill trend until the SEC revoked its registration on April 5, 2013. On its final day of trading, April 4, 2013, CNEP shares closed at $0.18 per share.

***Other Investigations and Regulatory Enforcement Actions Prior to the SEC Action***

85.    In June 2010, the first securities class action was filed against CNEP, Wang, Ju and others on behalf of all persons who purchased or acquired CNEP securities between May 15, 2008 and May 26, 2010. See *In re China North East Petroleum Holdings Limited Securities Litigation*, 10-cv-4577 (S.D.N.Y.) (ECF No. 39). Defendants in this action were not named as defendants in the securities litigation.

86.    Beginning in August 2010, the Department of Justice and the SEC began investigating allegations of wrongdoing by CNEP.

87.    In December 2010, the DOJ formally opened an investigative file in the matter, which explicitly noted that the investigation would be "in conjunction with" the SEC.

88.    The twin investigation was consistent with the broad mission of the SEC: "As an adjunct to the SEC's civil enforcement authority, the Division works closely with law enforcement agencies in the U.S. and around the world to bring criminal cases when appropriate." *The Investor's Advocate: How the SEC Protects Investors, Maintains Market Integrity, and Facilitates Capital Formation*, Sec.Gov, http://www.sec.gov/about/whatwedo.shtml (last visited Oct. 13, 2015).

89.    Over the course of the next two years, the DOJ and SEC shared both documents and information with each other regarding the investigation. The DOJ conducted interviews of approximately 18 witnesses; the SEC conducted depositions of approximately nine witnesses.

90.    On November 29, 2012, the SEC filed civil charges against Wang, Ju and others alleging conduct identical to the conduct at issue in the current matter. *See*

Complaint, *SEC v. China Ne. Petroleum Holdings Ltd.*, No. 12-cv-8696 (S.D.N.Y. Nov. 29, 2012) (ECF No. 1).

91.   On February 28, 2013, the DOJ filed a criminal complaint against Chao Jiang, CNEP's Vice President of corporate finance, and later indicted Wang and others, alleging that they transferred corporate funds, including funds raised in the course of two stock offerings, to the personal bank accounts of unnamed co-conspirators and their families (believed to include Wang's mother, Ju).  The Government alleged that the defendants in that case attempted to conceal this information from CNEP's Audit Committee by using their personal bank accounts in an effort to misstate CNEP's books and records.  The Government further alleged that these transactions were concealed from investors through false SEC filings.

### *The SEC Action Is Filed*

92.   On December 17, 2014, the SEC filed the SEC Action against the Defendants.

93.   As set forth more fully above and in the SEC Action, Defendants failed to follow PCAOB standards and U.S. GAAP and GAAS standards in auditing CNEP's financial statements, specifically by:

a.   Failing to exercise due professional care and lacking professional skepticism (AU §§ 230 and 334).

i.   Defendants lacked professional training in U.S. GAAP. According to the SEC Action, Defendants Ross and Kwok received only two days of U.S. GAAP training each year, and Kwok admitted to not having previous experience auditing a U.S. issuer.

ii.   The proper level of care was not exercised because before issuing the audit opinion, Defendants knew about material related-party transactions including, but not limited to: loans to and from insiders, offsetting agreements, and investments by insiders on behalf of CNEP.

iii.   Defendants also failed to apply an adequate level of professional skepticism.

b.       Failing to Adequately Plan the Audit (AU §§ 311 and 316).

i.       Auditors must understand the events, transactions, and practices that may have a significant effect on the company it is auditing. Auditors are required to become familiar with the company in which they are auditing to understand the risks associated with the company.

ii.       Defendants failed to obtain a level of knowledge of CNEP's business that would enable them to plan and perform the audit in accordance with PCAOB standards.

iii.       Auditors are required to plan their audits.  If there is a change in circumstances, an auditor is supposed to take this into consideration in its planning.

iv.       Defendants did not have an adequate understanding of CNEP's business. Although retained in January 2010, Defendant Kwok did not meet any CNEP personnel in person until 2011, and before finalizing the 2009 audit, Defendant Ross never visited CNEP's offices or field operations or speak with the CNEP's CFO, Baker Tilly's main contact.

v.       According to the SEC, there is no evidence that Defendant Ross reviewed the audit planning documents. According to PCAOB standards, Defendants should have re-evaluated and modified their procedures when new information came to light. The Audit Plan, however, was never revised after Defendants received the JLA Forensic Report which noted 176 related-party transactions occurred during 2009.

vi.       Defendants did not develop audit procedures that were designed to evaluate the risks presented by the related-party transactions.

c.       Failing to Design Procedures Tailored to the Risk of Misstatement and Failing to Properly Document Audit Risk (AU §§ 311 and 312).

i.       Auditors are required to implement risk assessment procedures when hired to assess financial statements in accordance with PCAOB

standards. When there are indications of higher risk, the auditor may have to expand the procedures applied or modify the procedures to obtain more persuasive evidence.

ii.     The JLA Forensic Report enlightened Defendants to CNEP's internal control deficiency regarding related-party transactions and the lack of control over management's ability to override internal controls to access CNEP's bank accounts. Due to all this information, Defendants should have identified additional risk areas and conducted additional testing to issue its audit report.

d.     Failing to Obtain Sufficient Competent Evidential Matter and Properly Audit Related-Party Transactions (AU §§ 326, 330, and 334).

i.     Auditors must obtain sufficient competent evidential matter to provide a reasonable basis for their audit opinions.  Auditors must consider the risk of the material misstatements when choosing their procedures to achieve the audit objectives. Auditors know that evidence from independent sources is better evidential matter with greater reliability than inside sources. When related-party transactions are identified as a risk, auditors are required to obtain satisfactory information concerning the purpose, nature and extent of those transactions to understand the business purpose of the transaction. When these transactions occur, the auditor must ensure that the transaction is adequately disclosed in financial statements. The higher the risk of the related-party transactions, the more additional procedures must be performed.

ii.     Defendants did not get sufficient evidence with regards to CNEP's related-party transactions to support the clean audit opinion they issued. Not only did Defendants fail to identify related parties, but they failed to identify the transactions themselves and to perform adequate procedures to gain an understanding of the business to determine the impact of these transactions on the business. Defendants did not collect audit evidence that justified CNEP's failure to adequately disclose the material, related-party transactions.

iii.     According to the SEC Action, Defendants' workpapers do not show anyone from Baker Tilly made a meaningful inquiry into the nature or

business purpose of the other material, related-party transactions or performed substantive procedures to verify those transactions.

iv. According to the JLA Forensic Report, there were post year-end adjustments which included transactions recording $5 million in "balance transfers" due from CNEP to Wang and Ju and $6.7 million related to "amount paid by Ms. Ju for acquiring Tian Cheng." There is no indication in Defendants' workpapers that they verified these post year-end adjustments.

v. One of the related-party transactions involved Wang's alleged capital infusion of $4.6 million into Song Yuan Technical, CNEP's subsidiary, on September 23, 2009. However, according to the SEC Action, conflicting information on CNEP's bank statement in connection with the 2009 offering proceeds indicate that the $4.6 million in question was transferred from CNEP not from Wang. Defendants' workpapers contain conflicting information as to the source of the $4.6 million. Defendants failed to determine and document the true source of these funds before issuing their clean audit opinion.

vi. When verifying if Wang was owed money from CNEP, Defendants sent confirmation papers directly to Wang, not a third party, making a mockery of the "confirmation process." Sending these confirmations to Wang failed to satisfy the burden to determine the completeness, existence and accuracy of the purported debt to Wang.

e. Failing To Prepare and Retain Adequate Audit Documentation (AS 3).

i. In order to conduct an audit in accordance with PCAOB, Auditing Standard ("AS") No. 3 requires the audit documentation to contain sufficient information such that another auditor with no connection with the engagement should understand the procedures performed, the results obtained, the conclusions reached, who worked on the engagement and when such work was conducted.

ii. Defendants did not act in accordance with AS No. 3. The SEC Action states that the workpapers do not consistently record what procedures

were performed, who performed the procedures, or the dates that the papers were reviewed. Defendants' workpapers do not sufficiently reflect their findings and conclusions about the related-party transactions.

94.     To the extent that any of the misrepresentations set forth herein are opinions, such opinions were both objectively and subjectively false.  Generally, the misrepresentations were that: (a) CNEP's financial statements were accurate; (b) CNEP's financial statements fairly presented the Company's position and results in conformity with U.S. GAAP; and (c) the audit report was conducted in accordance with PCAOB standards.

95.     In fact, these statements were not based on any facts to support them. Rather, they were contrary to the audit evidence that Defendants had obtained during the audit.  Defendants' statements were subjectively false because Defendants had actual knowledge of the facts that: CNEP's financial statements were not accurate because CNEP failed to properly disclose the material, related-party transactions in its financial statements as required by U.S. GAAP; and Defendants failed to conduct the audit in accordance with PCAOB standards.  See SEC Action at ¶¶ 5-39.

### *Applicability of Presumption of Reliance:  Fraud-on-the-Market Doctrine*

96.     At all relevant times, the market for CNEP's common stock was an efficient market for the following reasons, among others:

a.     CNEP's stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.     During the Class Period, several hundreds of thousands of CNEP stock were traded on a weekly basis on average, demonstrating a very strong presumption of an efficient market;

c.     As a regulated issuer, CNEP filed with the SEC periodic reports during the Class Period;

d.     CNEP regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-

- 28 -

ranging public disclosures, such as communications with the financial press and other similar reporting services;

e.     CNEP was followed by securities analysts who wrote reports that were distributed during the Class Period. Each of these reports were publicly available and entered the public marketplace; and

f.     Unexpected material news about CNEP was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

97.     As a result of the foregoing, the market for CNEP's common stock promptly digested current information regarding CNEP from all publicly available sources and reflected such information in CNEP's stock price. Under these circumstances, all purchasers of CNEP's common stock during the Class Period suffered similar injury through their purchase of CNEP's common stock at artificially inflated prices, and a presumption of reliance applies.

**_Applicability of Presumption of Reliance:  Affiliated Ute_**

98.     Neither Plaintiffs nor the Class need prove reliance – either individually or as a class because under the circumstances of this case, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in _Affiliated Ute Citizens of Utah v. United States,_ 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

99.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the common stock of CNEP during the Class Period and who were damaged thereby. Excluded from the Class are the Defendants, the current and former officers and directors of Baker Tilly or the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which the Defendants have or had a controlling interest.

100.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CNEP's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by CNEP or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

101.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

102.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

103.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by the Defendants' acts as alleged herein;

b.   whether the misstatements and omissions alleged herein were made with scienter;

c.   whether statements made by the Defendants to the investing public during the Class Period misrepresented and/or omitted material facts about the business, prospects, and operations of CNEP; and

d.   to what extent the members of the Class have sustained damages and the proper measure of damages.

104.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively

small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

105.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

106.   This First Claim is asserted against all Defendants.

107.   During the Class Period, the Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and/or sell CNEP common stock at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

108.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of CNEP as specified herein.

109.   Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CNEP's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CNEP and its business operations and future prospects, in light of the circumstances under which they were made, not misleading.  As set forth more particularly herein,

- 31 -

Defendants engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of CNEP's common stock during the Class Period.

110. Defendants' primary liability, and controlling person liability in the case of Defendants Ross and Kwok arise from the following facts: (i) Defendants are partners and/or employees of Baker Tilly; (ii) by virtue of their responsibilities and activities as partners/employees of Baker Tilly, Defendants were privy to and participated in the creation, development and reporting of Baker Tilly's audit reports; (iii) Defendants enjoyed significant personal contact and familiarity with the other partners of Baker Tilly; and (iv) the Defendants were aware of Baker Tilly's issuance of its audit reports, relating to CNEP's financial statements, to the investing public which they knew or recklessly disregarded were materially false and misleading.

111. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing CNEP's financial condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' false and misleading statements during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those statements were false or misleading.

112. Defendants consented to the incorporation of the auditor report regarding CNEP's financial statements.

113. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price for CNEPs common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of CNEP's publicly-traded common stock were

artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired and/or sold CNEP common stock during the Class Period at artificially high prices and were damaged thereby.

114.  At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding CNEP's financial results, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired CNEP common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

115.  By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

116.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

117.  This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

### SECOND CLAIM

### Violation Of Section 20(a) of The Exchange Act

### Against Ross and Kwok

118.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

119.  This Second Claim is asserted against Defendants Ross and Kwok.

120.   Ross and Kwok acted as controlling persons of Baker Tilly within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, their ownership and contractual rights, and participation in and/or awareness of Baker Tilly's operations and/or involvement in Baker Tilly's audit of CNEP, Defendants Ross and Kwok had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Baker Tilly and its audit of CNEP, including the contents of CNEP's audit reports.

121.   In particular, Ross and Kwok had direct and supervisory involvement in the day-to-day operations of Baker Tilly and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

122.   As set forth above, Baker Tilly violated Section 10(b) and Rule 10b-5. By virtue of their positions as controlling persons, Defendants Ross and Kwok are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants Ross and Kwok's wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the CNEP's common stock during the Class Period.

123.   This action was filed within two years of discovery of the fraud and within five years of each Plaintiffs' purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a.   Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

b.   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: March 10, 2016                    Respectfully submitted,

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**

By:              */s/ Rachele R. Rickert*
                 RACHELE R. RICKERT

FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
MARISA C. LIVESAY (223247)
livesay@whafh.com
BRITTANY N. DEJONG (258766)
dejong@whafh.com
750 B Street, Suite 2770
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:   619/234-4599


**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
MATTHEW M. GUINEY
(admitted *pro hac vice*)
270 Madison Ave.
New York, NY 10016
Telephone: 212/545-4600
guiney@whafh.com

*Lead Counsel for the Class*

CNEP/22779v3

- 35 -